## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: | |
| CHRISTOPHER PATRICK BOYD | Case No. 22-12455 TBM |
| Debtor | Chapter 13 |
| | |
| HEMP RECOVERY COMPANY, LLC | |
| Plaintiff | |
| v. | Adv Case No. 22-01258 TBM |
| CHRISTOPHER PATRICK BOYD | |
| Defendant | |

### RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

**COMES NOW** Christopher Boyd ("Defendant"), by and through his undersigned attorneys, and hereby responds to the Motion for Summary Judgment ("Motion") filed by Hemp Recovery Company, LLC ("Plaintiff") pursuant to a claim under 11 U.S.C. § 523(a)(2)(A) and Fed.R.Bankr.P. 7056, and as grounds therefore states as follows:

### STATEMENT OF THE BURDEN OF PROOF

The standard of proof for an action under Section 523(a) is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L.Ed.2d 755 (1991). Pursuant to FED.R.CIV.P. 56(a), as applied to adversary proceedings by FED.R.BANKR.P. 7056, the record must demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 105 S. Ct. 2548, 91 L.Ed.2d 265 (1986) ("party seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion.")

1

In applying such standard, the Court shall "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir.1999). "[S]ummary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Punt v. Kelly Services*, 862 F.3d 1040,1046 (10th Cir. 2017).  Fed.R.Civ.P. 56.

## SUMMARY OF PLAINTIFF'S ARGUMENT

Plaintiff sued Defendant and others in state court under various legal theories. Within the state court matter, Plaintiff failed to prove, as to Defendant, civil theft, securities fraud, untrue statements, scheme to defraud and unjust enrichment. Plaintiff prevailed as to its claims, under state law, of false representation, nondisclosure and concealment, and negligent misrepresentation.

Plaintiff proceeds in this forum under § 523(a)(2)(A).  As such, it relies heavily on a state court judgment and an appellate order entered against Defendant for the proposition that summary judgment is appropriate. Plaintiff argues that all of the elements of collateral estoppel are present to warrant entry of judgment against Defendant as a matter of law.

## PLAINTIFF'S ASSERTIONS

Plaintiff claims that the parties entered a *processing agreement* in August of 2017 with Defendant's company, Foothills Ventures ("Foothills.") That the agreement was for Foothills to extract and process Plaintiff's hemp.

Plaintiff claims:

1. That Defendant represented that Foothills Ventures had the ability to perform;
2. Plaintiff relied on those representations;
3. That 4415 pounds of hemp was delivered to Foothills;
4. That Foothills failed to process the hemp, failed to provide a third party with CBD oil, failed to return the hemp and its barrels, and failed to pay a third party for the value of the hemp and some barrels.

The motion frequently mentions a *processing agreement* yet nothing is attached as an exhibit. That is because the parties did not have a written agreement. [1] The term *processing agreement* is a kind way of saying the parties talked. And what did they discuss?

Except for some text messages, and with no written agreement, representations that Plaintiff's claims were made to it by Defendant and/or by third parties were verbal.

And those discussions focused around Foothills and its ability to fulfill an agreement between the parties.  Any boasting or puffery by the state court Defendants regarding an ability to perform, if it did occur, constitute statements about a "financial condition."

## STATE COURT LITIGATION

Plaintiff commenced litigation in state court against Defendant and other parties, before Judge Morris Hoffman.[2]  After a three-day trial, the court made the following findings: [3]

a. I suspect Alan Boyd has a lot more to do with Sling Logistics than we know. But that's a suspicion -- I'll talk about this a little later -- that Plaintiff has not really proved in this case. But I suspect it to be true. P. 161.

b. From the very beginning, the four of these people, the two Desmonds and the two Boyds, have always been talking about two different -- somewhat overlapping, but largely parallel -- things.  P. 165.

c. The Boyds, both of them, had represented they could do this through the entity -- the other Defendant is Foothills Ventures.  They didn't do it.  They made rep -- misrepresentations about their ability to do it. P. 166.

d. We had an agreement you would extract our forty-four hundred pounds. We would split the CBD oil fifty-fifty. P. 167.

---

[1] Defendant propounded discovery upon Plaintiff in the case at bar.  Specifically, Defendant requested a copy of any written agreement as to the extraction of CBD oil between the parties. Plaintiff produced hundreds of documents, none of which purport to be a written agreement as to the subject business venture.

[2] Styled *Hemp Recovery Co, LLC v. Thomas Alan Boyd, Christopher P. Boyd, Foothills Ventures, LLC and Sling Logistics, LLC*, Denver County District Court, case number 2019CV30498.

[3] See Plaintiff's Exhibit no.: 2, transcript of the January 15, 2020 hearing before Judge Morris Hoffman, beginning on p. 162.

e. Where Mr. Christopher Boyd and his wife actually did some of the product creation using some of the CBD oil. But this was all -- I'm not entirely clear on this. P. 167.

f. There's no dispute that Mr. Desmond sent a hundred and eighty thousand dollars to Sling Logistics. P. 168.

g. I have no idea what his agreement was with Sling. I have nothing to do with Sling. Sling is Matt and that's all there is to it. I had nothing to do with this. I have no idea why he sent in a hundred and eighty thousand dollars. I have no idea what he got for it. I have no idea why he didn't get anything for it. All right. Here's how I resolve this dispute. In terms of bucket one, I find that on or about August 19th, 2017, both of the Desmonds and both of the Boyds reached an agreement. A standard agreement in the industry under which the Desmonds would send the Boyds forty-four hundred pounds of hemp. And the Boyds would extract that hemp for CBD oil. And they would split that fifty-fifty. Pp. 170-171.

h. I think what happened is that there was a misrepresentation from the very beginning. And that by the time Mr. Desmond realized there was this misrepresentation -- and, frankly, also because he still wanted to make a lot of money with Alan Boyd in filling this general financing space. That he decided to keep going along with this, and bought the equipment for them.

i. I find that Alan Boyd -- but again, not Chris Boyd -- induced Mr. Desmond to invest in this factoring scheme with Sling Logic [sic]. I believe Mr. Desmond, that Alan Boyd touted this factoring as an easy way to make some short-term money. I mean, heck, it was six to nine percent per month. And this was the way to do it. P. 174.

j. Because I have really no idea what Alan Boyd has to do with Sling Logistics. I think he prob -- as I already said, I think he probably has something to do with it. I don't think Christopher Boyd has anything to do with Sling Logistics. And I don't think he knows what happened to this hemp. As to the -- let me talk now about bucket two, the factoring. I find that Alan Boyd -- but again, not Chris Boyd -- induced Mr. Desmond to invest in this factoring scheme with Sling Logic [sic]. P. 174.

k. Alan Boyd fraudulently entered into this agreement by claiming that he was the chief operating officer, which he was not and never had been. His own connection to Transtar is that his son owned it, or owned an interest in it. And his son let him use the name Transtar in his email address. P. 174.

4

l. And Transtar Financial, LLC. It is signed, apparently, by Mr. Killinger and signed by Alan Boyd as COO. I think that means chief operating officer of Transtar Financial, LLC. That was false. Alan Boyd had, I believe, Christopher Boyd's testimony that Alan Boyd had nothing to do with Transtar Financial. That was Christopher Boyd's company. Alan Boyd fraudulently entered into this agreement by claiming that he was the chief operating officer, which he was not and never had been. His own connection to Transtar is that his son owned it, or owned an interest in it. And his son let him use the name Transtar in his email address. That's as much as Alan Boyd has to do with Transtar. And yet, we have this participation agreement with him entering it, allegedly, entering it -- purporting to enter into it on behalf of Transtar. P. 174.

m. And yet, we have this participation agreement with him entering it, allegedly, entering it -- purporting to enter into it on behalf of Transtar. By the way, it's called participation agreement, but it's a factoring agreement when you read the definitions. P. 175.

n. In making -- in inducing Mr. Desmond to make this investment in Sling Logistics, Alan Boyd not only -- Alan Boyd not only educated Mr. Desmond and thereby induced him into doing this. But he also failed to disclose to Mr. Desmond that he, Alan Boyd, had been convicted of prior felonies in Federal Court. He also failed to disclose that at the moment the Desmonds parted with their forty four hundred pounds of hemp to have the Boyds extract. Alan Boyd also never told Mr. Desmond, either at the time Mr. Desmond -- he induced Mr. Desmond to invest in Sling. Or at the time he induced Mr. Desmond to hand over forty-four pounds of hemp. That the other -- some of the other people that Mr. Alan Boyd induced to invest with Sling were prison buddies of his. And of course, at neither time did he disclose to either of the Desmonds that he was facing an eleven-million-dollar restitution judgement as a result of that criminal case in Federal Court. P. 177.

o. I find that Plaintiff has proved that Christopher Boyd -- and I don't think Mr. Christopher Boyd denies he was an agent of Foothill Ventures. In fact, he's the principal owner. I think eighty percent owner of Foothills Ventures. They've not proved Christopher Boyd was an agent of Sling Logistics. And in fact, again, they're not aiming any of the second bucket, the factoring bucket at Christopher Boyd. I also find -- and this goes back to what I said earlier -- that the Plaintiffs have not proved, to my satisfaction, even just to a preponderance, that Alan Boyd was an agent of Sling Logistics. P. 180.

p. And to me, I need to know much more about what happened to these things to reach the conclusions, generally, that Alan Boyd was the agent of Sling. I do think Alan Boyd was the agent of Foothills Ventures. He -- his -- he was part of this discussion with the Desmonds about how they could handle the extraction. P. 181.

q. But some of this agency issue depends on me knowing much more about tracing. And to me, I need to know much more about what happened to these things to reach the conclusions, generally, that Alan Boyd was the agent of Sling. I do think Alan Boyd was the agent of Foothills Ventures. He -- his -- he was part of this discussion with the Desmonds about how they could handle the extraction. P. 181.

r. By the way, I need to acknowledge that the Desmonds have assigned their claims to the Plaintiff. That's why I've been calling them Desmonds instead of Plaintiffs. They are not the Plaintiff. The Plaintiff in this case is Hemp Recovery Company. And the assignment is of record. The Plaintiff has eight claims. All eight of them were at least originally alleged in both buckets. And at least originally also alleged against all four Defendants. P. 181.

s. The eight claims of civil theft, securities fraud, untrue statement, securities fraud, scheme to defraud, false representation -- that's -- I'm going to lump fourth, fifth and sixth claims all together as common law fraud claims. Plaintiff calls them false representation. (inaudible) claim four, nondisclosure. Concealment, that's claim five. And negligent misrepresentation, claim six. I'm lumping them all into fraud. P. 181.

t. But that's why the civil theft statute talks about obtain or retain property. Plaintiffs have proved -- Plaintiff has proved the first three elements. But I don't think they've proved intentional or knowing deprivation of the property, permanently. This requires a high level of mens rea. It's not just reckless. It's not just that Alan picked a bad person to store the prop -- to store this. That he was negligent in not keeping track of it. He didn't know who ran the warehouse, for crying out loud. All of that's negligent. It's not knowing. To prove -- and I know that civil theft doesn't require reliance, exactly. It -- except in the sense of being permanently deprived. And there's no doubt they were permanently deprived. But the Plaintiff has to prove that the Defendants knowingly deprived them, or intentionally deprived them. And here's where tracing what happened to this would have been of some benefit. I have no idea if either of these Defendants benefitted at all from the theft of the forty-four hundred pounds. P. 182.

6

u.  Plaintiff has to prove that these Defendants were almost certain -- knew that it was almost certain that by doing what they did, the Desmonds would lose the forty-four hundred in product.  And lose the hundred and eighty thousand dollar in investment.  And they just haven't proved that.  They've proved, as I'll talk about later, that Alan Boyd induced this investment.  But they haven't proved that he got anything from it.  Although, I have suspicions.  And therefore, they just haven't proved these high mens rea that are required for that fourth level of civil theft.  So the civil theft count is dismissed with prejudice.  P. 183.

v.  Let me lump all the so-called fault/fraud claims together, four, five and six.  False representation, nondisclosures, and negligent misrepresentation.  These are common law versions of fraud with slightly different elements.  But for all of the reasons I've already found in connection with the securities fraud, I find that the Plaintiff has proved these common law fraud type claims against Alan Boyd as to both buckets.  As to -- and as against Christopher Boyd as to the hemp bucket.  P. 191.

## STATEMENT OF THE LAW

### The Elements of Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, **other than a statement in writing respecting the debtor's or an insider's financial condition**." 11 U.S.C. § 523(a)(2)(A). [Emphasis provided.]

To prevail on a Section 523(a)(2)(A) claim, a creditor must establish five elements:

1.  that the debtor made a false representation;
2.  that the debtor knew the representation was false at the time it was made;
3.  that the debtor made the false representation with the intent to deceive the creditor;
4.  that the creditor justifiably relied on the representation; and
5.  that the creditor sustained a loss that was proximately caused by the false representation.

**The Elements of Common Law Fraud in Colorado**

1. defendant made a false representation of a material fact;
2. that the party making the representation knew it was false;
3. that the party to whom the representation was made did not know of the falsity;
4. that the representation was made with the intent that it be acted upon;
5. and that the representation resulted in damages.

*Brody v. Bock*, 897 P.2d 769 (Colo. 1995), at 775-776.

The two definitions are similar but not identical. The principle differences are:

a. Section 523(a)(2)(A) prohibits the use of verbal statements regarding financial condition. Common law fraud has no such limitation, and
b. Section 523(a)(2)(A) requires a showing of justifiable reliance by the aggrieved. Again, that is not within the definition of common law fraud.

## PRECLUSION IS UNAVAILABLE TO PLAINTIFF

Plaintiff argues that this court can enter judgment, as a matter of law, without the need for additional evidence. As described above, the problem with this argument is that § 523(a)(2)(A) is not identical to the common law claims of fraud, false pretenses and the like.[4]

In the oft cited case of *In re Riggle*, 389 B.R. 167 (D. Colo. 2007), Judge Babcock addresses the issue  collateral estoppel under Colorado law. Noting that collateral estoppel is an equitable doctrine applied at the court's discretion and need not be applied in every case, Riggle states:

> [a]s this appeal arises out of a judgment of a Colorado District Court, Colorado law determines the preclusive effect of the state judgment. Under Colorado law, the doctrine of collateral estoppel "bars relitigation of an issue if: **(1) The issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding;** (2) The party against whom estoppel was sought was a party to or was in

---

[4] Claims within section 523(a) do not often mirror similar yet different causes of action under state law. For example, the Colorado Trust Fund Statute declares contractors as fiduciaries. 11 U.S.C. § 523(a)(4) excepts from discharge debts incurred for breach of fiduciary duty. However, the latter statute also requires a showing of defalcation. The state statute has no such requirement. *See* Colo.Rev.Stat. § 38-22-102.

privity with a party to the prior proceeding; **(3) There was a final judgment on the merits in the prior proceeding;** (4) The party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding."

*Riggle*, at 173, (Emphasis added.)

The Tenth Circuit in *In re Wallace,* 840 F.2d 762 (10th Cir. 1988) determined that while the bankruptcy court ultimately decides if a debt is dischargeable under § 523, collateral estoppel may be invoked to prevent a party from relitigating settled facts. The court set forth three conditions which would result in a party being bound by previous litigation:

1. the issue to be precluded is the same as that involved in the prior state action;
2. the issue was actually litigated by the parties in the prior action; and
3. the state court's determination of the issue was necessary to the resulting final and valid judgment.

*Id.* at 765.

Given the (surprising) absence of a written agreement between the Desmonds and the Boyds, it is fair to assume that Judge Hoffman relied upon conversations between the parties as to their dealings.  And most references to representations, if almost exclusively, came from Alan Boyd, and had to do with "financial condition." That is, an ability to perform.

In support of its argument there is no "genuine issue of fact," Plaintiff cites to various state court orders and a transcript of testimony from the trial. Plaintiff attaches no affidavits or declarations by witnesses under penalty of perjury.

Within its motion, Plaintiff represents, again and again, what appear to be conversations between the parties as to Foothills' ability to perform, and the like.

The Tenth Circuit writes:

Title 11, United States Code § 523(a)(2)(A) generally bars the discharge of the debts of an individual debtor to the extent that those debts were obtained by false pretenses, a false representation, or actual fraud. However, to the extent that those debts were obtained by the use of a false oral statement respecting the debtor's or an insider's financial condition,

they are dischargeable. We hold that such false statements are those that purport to present a picture of the debtor's overall financial health. **Statements that present a picture of a debtor's overall financial health include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities. However, such statements need not carry the formality of a balance sheet, income statement, statement of changes in financial position, or income and debt statement.** What is important is not the formality of the statement, but the information contained within it — information as to the debtor's or insider's overall net worth or overall income flow.

*In re Joelson*, 427 F.3d 700, 714 (10th Cir. 2005). [Emphasis provided.]

*See, also, Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct. 1752 (2018).[5]

To the extent Judge Hoffman's findings refer to financial condition, such statements are inadmissible in the case at bar.

## THE STATE COURT ORDER PROVIDES SOME GUIDANCE TO THIS COURT, BUT THERE IS NO SHOWING OF JUSTIFIABLE RELIANCE ON THE PART OF PLAINTIFF

On January 15, 2020, Judge Hoffman entered an order. Therein, he finds all four defendants liable under various theories.

While these findings were, apparently, sufficient to find against Defendant in state court, they fall short of the requirements of § 523(a)(2)(A).  Frankly, they fell short in the state court matter, as the issue  of reliance is not addressed in Judge Hoffman's finding of fraud.[6]

---

[5] "Had Congress intended § 523(a)(2)(B) to encompass only statements expressing the balance of a debtor's assets and liabilities, it could have so specified — *e.g.,* "statement of the debtor's financial condition." The Court also agrees that a statement is "respecting" a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status. A single asset has a direct relation to and impact on aggregate financial condition, so a statement about that asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent. A statement about a single asset, thus, can be a "statement respecting the debtor's financial condition." *Id*, at 1755.

[6] The word "reliance" is employed four times in Exhibit 2. The state court found it unnecessary to find reliance in the limited context of the causes of action before it.

As the Supreme Court held, exceptions to discharge under § 523(a)(2)(A) includes "actual fraud," including fraudulent conveyances.  No such facts exist in the case at bar.[7]

The "deal" between the Desmonds and Boyds was commonplace within the Hemp/CBD industry.  Among "extraction companies," standard operating procedure was to take 50% of the hemp biomass in exchange for turning product into CBD isolate, the producers keeping the remaining 50%  isolate. This was viewed as a "win-win" for all concerned.  Around the time that the Desmonds entered their verbal deal, the market lacked sufficient hemp biomass to meet demand.  Across the country, thousands of farmers grew hemp with the hope of getting on the CBD bandwagon.

Ultimately, the supply of hemp/CBD isolate became saturated, and the profitability of CBD isolate fell through the floor.  Factors affecting the saturated market included no limit of "growing" or "extraction" licenses by the government, excessive production of biomass from the farming industry.

Not unlike most saturated markets and market crashes, the cost of biomass product fell from $22 per pound to one dollar per pound.[8]  In 2022, the price is forty-seven cents per pound. [9]

The allure of quick cash attracted many "investors" with little or no experience in farming, and no experience in extracting CBD isolate.  And like the tulip craze in Holland of the 17th Century, it was *the* get-rich quick scheme of the last ten years.

And soon after the market crashed, the finger-pointing started.

## NO EVIDENCE OF JUSTIFIABLE RELIANCE

The 10th Circuit addressed the requirement of reliance within § 523(a)(2)(A).

> In determining whether a creditor's reliance was justifiable, a court should therefore examine 'the qualities and characteristics of the particular

---

[7] "It is therefore sensible to start with the presumption that Congress did not intend 'actual fraud' to mean the same thing as 'a false representation,' as the Fifth Circuit's holding suggests. But the historical meaning of 'actual fraud' provides even stronger evidence that the phrase has long encompassed the kind of conduct alleged to have occurred here: a transfer scheme designed to hinder the collection of debt." *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016).

[8] https://www.nnbw.com/news/2021/aug/25/massive-oversupply-nevada-hemp-farmers-scale-back-/

[9] https://www.hempbenchmarks.com/hemp-market-insider/march-2022-hemp-spot-price-index-report/

plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases.' *Id.* at 71, 116 S.Ct. 437 (quotation omitted). Even under the 'justifiable' test, however, the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it. *Id.* (quotation omitted). Moreover, this test 'does not leave [objective] reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the [objectively] reasonable, the greater the doubt about reliance in fact.' *Id.* at 76, 116 S.Ct. 437. In effect, 'reasonableness goes to the probability of actual reliance.' *Id.*

*In re Riebesell*, 586 F.3d 782 (10th Cir. 2009), at 792.

Applying *Riebesell* to the case at bar, gleamed from the trial transcript, the Desmonds had backgrounds in business and farming.  As to the "quality and characteristics" of the Desmonds, these were no straw-chewing hayseed rubes. These were "investors" who sensed the time was right to get into the hot business of CBD extract.  Judge Hoffman found it surprising there was a paucity of documents.[10]

While "good fences make good neighbors,"[11] the parties approach to the venture was, at best, informal, and worse, sloppy.  And consistent with such informalities, there is no evidence that the Desmonds performed even a modicum of probing, inquiry or the like prior to entering the verbal agreements with the Boyds. No "cursory  examination or investigation" of the Boyds, Foothills or Sling.

No review of a website, if one existed, conversations with past customers or references.  No review of balance sheets, tax returns, bank statements.  No inspection of equipment, no credit reports, background checks.

### ASSUMING ARGUENDO THE ASSIGNMENT OF THE CLAIM IS VALID, PLAINTIFF SEEKS TO PROSECUTE AN INTENTIONAL TORT FOR WHICH IT IS NOT A VICTIM—SUCH A CLAIM IS BARRED BY THE DOCTRINE OF CHAMPERTY.  PLAINTIFF IS NOT THE REAL PARTY IN INTEREST.

---

[10] Judge Hoffman: "First of all, there basically are no documents. At least not the kinds of documents we would expect in a case like this. There are no operating documents. There's no written extraction agreement. There's no signed factoring agreement. The documents, instead of being contracts or operating agreements, are mostly texts and emails. Which I have to say, in general, have not been terribly helpful in me resolving this giant conflict between these two stories."  Exhibit 2, p. 157.

[11] *Mending Wall* by Robert Frost.  https://www.poetryfoundation.org/poems/44266/mending-wall

In his findings, Judge Hoffman notes that the Desmonds assigned their claims against Defendants. [12]  Plaintiff's Cause of Action is for violation of 11 U.S.C. § 523 (a)(2)(A)—false pretenses, false representation or actual fraud.  These claims are intentional torts.  An intentional tort is when an individual or entity purposely engages in conduct that causes injury or damage to another.

Champerty is defined as:

> a bargain by a person with a plaintiff or a defendant for a portion of the matter involved in a suit in the event of a successful termination of the action, which the person undertakes to maintain or carry on at his own expense. *State v. Chitty,* 17 S.C.L. (1 Bail.) 379, 400 (1830); 14 C.J.S. *Champerty and Maintenance* § 2 (1991); 14 Am.Jur.2d *Champerty and Maintenance* § 3 (1964). A champertor is one who purchases an interest in the outcome of a case in which he has no interest otherwise. A champertous agreement is unlawful and void where the rule of champerty is recognized, and the tainted agreement is unenforceable. 14 C.J.S. *Champerty and Maintenance* § 17; 14 Am.Jur.2d *Champerty and Maintenance* § 7.

*Osprey, Inc. v. Cabana Ltd. Partnership*, 532 S.E.2d 269  (S.C. 2000), at 373.

Colorado recognizes the concept of champerty.  *See In re Thomas*, 387 B.R. 808 (D. Colo. 2008).  As such, the assignment of an intentional tort to an unrelated third party to champion is an unenforceable agreement.  To the extent there exists any claims against Defendant, Mr. and Mrs. Desmond may be the real parties in interest, but not *Hemp Recovery Company, LLC*.  See Fed.R.Civ.P. 17(a), as adopted in Fed.R.Bankr.P. 7017. [13]

### *IN RE BARTENWERFER* AND LIABILITY OF DEFENDANT

In *Bartenewerfer*, a couple formed a partnership to "flip" houses. The woman was mostly uninvolved in the business dealings.  Relying on its decision in *In re Strang*, 114 U.S. 561, wherein the Court held the "fraud of one partner . . . is the fraud of all because '[e]ach partner was the agent and representative of the firm with reference to all business within the scope of the partnership.' *Strang*, *supra*,

114 U.S. at 561. "The unmistakable implication," Justice Barrett said, "is that Congress embraced *Strang*'s holding — so we do too."

---

[12] Exhibit 2, at p. 181.
[13] It is not clear whether the claim was assigned irrevocably or revocably.  No matter, as this Plaintiff lacks standing.

Applying *Bartenwerfer* to the case at bar, Judge Hoffman found that Defendant's father, Alan Boyd, was an agent of Defendant Foothills. And Christopher Boyd was a part owner of Foothills. Judgment entered, jointly and severally, against all four Defendants for fraud. A cursory review of the findings of fact reveals that the court's ire was mostly, and almost exclusively, directed towards Alan Boyd and not his son, the Defendant. Still, Defendant's ownership interest in Foothills, and his "standing too close" to Alan, exposed Defendant to liability. And given the direction from the Supreme Court in *Bartenwerfer*, admittedly, that is a problem for the Defendant.

If Alan Boyd were on trial before this court and being prosecuted under § 523(a)(2)(A), his statements as to the "financial condition" and ability to perform would properly be excluded. False statements as to other matters would probably come in. [14] Despite the Desmonds' argument in closing of Christopher Boyd's culpability, the state court did not adopt or embrace nary any claims against him. Still, the findings involving Alan Boyd are troubling.

## STATEMENT OF DISPUTED FACTS

Applying FED.R.CIV.P. 56(a), the record must demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317.

Relevant to the instant inquiry, Defendant asserts the following are disputed facts:

      a. was Plaintiff's reliance upon representations justifiable?
      b. Does the assignment of the claim from the Desmonds to Hemp Recovery Company, LLC violate the rules of champerty?
      c. Who is the real party in interest?

In its Motion for Summary Judgment, Plaintiff raises the following facts. Defendant's responses to Plaintiff's list are as follows:

1. The "processing agreement." Apparently all verbal. To the extent there were verbal representations as to ability to perform and the like, those are statements regarding "financial condition" and as such, inadmissible.

2. Alan Boyd's criminal conviction. Question of relevance. Did Christopher Boyd have a duty to disclose? With no written application or similar request, rhetorically--when did the Desmonds ask Alan Boyd or Christopher Boyd about "character?"

---

[14] See Exhibit 2, pp. 160-161.

## CONCLUSION

Plaintiff references the required showing of justifiable reliance, yet skips over that requirement in its argument that collateral estoppel applies in the case at bar. And little wonder, as the state court fails to address it. And Plaintiff fails to note justifiable reliance as differing from the state's definition of fraud differs from that within § 523(a)(2)(A).

Public policy prohibits the assignment of these claims in tort to an unrelated third party. While the state court expressed its incredulity as to Alan Boyd, it did not paint Christopher Boyd with the same broad brush. Just the opposite. It found Christopher Boyd credible. Yet the recent decision of *Bartenwerfer* poses challenges to this Defendant.

There is little evidence that Christopher Boyd was guilty of fraud, other than the conclusory statement from Judge Hoffman, and reference to a "hemp bucket." [15] Christopher Boyd's single biggest mistake was not conducting himself in a less than honorable manner. It was getting into business with his father.

WHEREFORE, Defendant prays the Court deny Plaintiff's Motion for Summary Judgment and for such further relief as the Court deems appropriate.

Dated:  May 23, 2023                     */s/ Stephen Berken*
Stephen E. Berken #14926
Berken Cloyes PC
1159 Delaware Street
Denver, CO   80204
(303) 623-4357
Email: stephenberkenlaw@gmail.com
Attorneys for Defendant

---

[15] Exhibit 2, p. 191.

## <u>CERTIFICATE OF MAILING</u>

I hereby certify that on this 23rd day of May 2023, I served a true and correct copy of the foregoing Response via the court's electronic filing system/ecf, addressed to the following:

Via CM/ECF

Michael Lamb   via ecf: mcl@kjblaw.com

Chris Boyd
1545 Skimmer Street
Berthoud, CO 80513

By:  */s/ Sean Cloyes*

16